### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

**JESSICA HILL and**
**MARCIA RODRIGUEZ**

**VERSUS**

**UNUM LIFE INSURANCE**
**COMPANY OF AMERICA,**
**KINDRED HEALTHCARE**
**OPERATING, INC. EMPLOYEE**
**MEDICAL AND WELFARE**
**BENEFITS PLAN, KINDRED**
**HEALTHCARE OPERATING, INC.,**
**AND MERCER HEALTH AND**
**BENEFITS LLC**

**CIVIL ACTION**

**DOCKET NO.**
**4:21-cv-1922**

## COMPLAINT

1.    Plaintiffs, **JESSICA HILL and MARCIA RODRIGUEZ**, file this Complaint against Defendants, **UNUM LIFE INSURANCE COMPANY OF AMERICA (hereinafter "UNUM"), KINDRED HEALTHCARE OPERATING, INC., EMPLOYEE MEDICAL AND WELFARE BENEFITS PLAN (hereinafter "The Plan"), KINDRED HEALTHCARE OPERATING, INC. (hereinafter "KINDRED") and MERCER HEALTH AND BENEFITS, LLC (hereinafter "MERCER").**

### JURISDICTION and VENUE

2.    Federal question subject matter jurisdiction under 28 U.S.C. 1331 applies to this case, as it is governed by federal law under the Employee Retirement Income Security Act of 1972 (ERISA), 29 U.S.C. 1001, *et. seq.,* because Plaintiff is claiming benefits under an ERISA- governed employee benefits plan, and under ERISA, "a

person denied benefits under an employee benefit plan [may] challenge that denial in federal court." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008) (citing 29 U.S.C. § 1001, *et seq.*, 29 U.S.C. § 1132(a)(1)(B)).

Venue is proper in this district under 28 U.S.C. §1391(b) because a substantial part of the events giving rise to the claim occurred in this district, and under 28 U.S.C. §1391 (c) and (d), and 29 U.S.C. § 1132(e), ERISA § 502(e), because Defendants reside in this district, and may be found in this district by being subject to personal jurisdiction in this district for the controversy at issue herein.

## <u>PARTIES</u>

3.     Plaintiff, **JESSICA HILL**, is a natural person of the full age of majority and at all times material hereto has resided and been a citizen of the City of Humble, County of Harris, State of Texas.

4.     Plaintiff, **MARCIA RODRIGUEZ**, is a natural person of the full age of majority and at all times material hereto has resided and been a citizen of the City of Houston, County of Harris, State of Texas.

5.     Defendant, **UNUM,** is a Maine Corporation with its principal business establishment in Portland, Maine, authorized to do and doing business in Texas.

6.     Defendant, **THE PLAN**, is a group employee benefit plan established in the State of Kentucky by Defendant, **KINDRED**, for the benefit of its employees.

7.     Defendant, **KINDRED** is a Delaware corporation with its principal business establishment in Kentucky, authorized to do and doing business in Texas.

8.      Defendant, **MERCER** is a Delaware corporation with its principal business establishment in New York, authorized to do and doing business in Texas.

9.      At all relevant times, Plaintiff, **JESSICA HILL**, was the natural daughter of her now-deceased mother, Teressa Rodriguez ("Decedent").

10.     At all relevant times, Plaintiff, **MARCIA RODRIGUEZ**, was the natural daughter of Decedent.

11.     At all relevant times, Decedent was employed by Defendant, **KINDRED**.

12.     At all relevant times, Decedent was a participant employee of **THE PLAN**.

13.     **THE PLAN** provided benefits which included basic and voluntary supplemental life insurance benefits in the event of Decedent's death for which Plaintiffs were both beneficiaries.

14.     At all relevant times, Defendant, **KINDRED**, was the Plan Sponsor, Plan Administrator and a fiduciary of **THE PLAN**.

15.     At all relevant times, **KINDRED** had authority to control and manage the operation and administration of **THE PLAN**.

16.     At all relevant times, Defendant, **MERCER**, was under contract with **KINDRED** wherein it agreed and undertook to participate in the control and management of the operation and administration of **THE PLAN** relevant to the allegations herein and was a fiduciary of **THE PLAN**.

17.     At all relevant times, Decedent, as a participant employee of **THE PLAN**, was insured by a policy of basic life insurance and voluntary supplemental life insurance coverage ("The Unum Policies") issued to **THE PLAN** by Defendant, **UNUM**.

18.     At all relevant times, Defendant, **UNUM**, was Plan Claims Administrator and a fiduciary of **THE PLAN**.

19.     At all relevant times, Plaintiffs were beneficiaries of **THE PLAN** and The Unum Policies in the event of Decedent's death.

### THE RELEVANT POLICY PROVISIONS

20.     The Policy provides, in pertinent part:

*"ONCE YOUR COVERAGE BEGINS, WHAT HAPPENS IF YOU ARE NOT WORKING DUE TO INJURY OR SICKNESS?*

If you are not working due to injury or sickness, and if premium is paid, you may continue to be covered up to your retirement date."…

*"WHAT INSURANCE IS AVAILABLE WHEN COVERAGE ENDS? (Conversion   Privilege)*

When coverage ends under the plan, you and your dependents can convert your coverages to individual life policies, without evidence of insurability…

You and your dependents must apply for individual life insurance under this life conversion privilege and pay the first premium within 31 days after the date:

        - your employment terminates; or

        - you or your dependents no longer are eligible to participate in the coverage of the plan…

*"APPLYING FOR CONVERSION*

If your coverage terminates, Unum will be notified by your Employer and a conversion application form which includes cost information will be mailed to your home address.

When you complete the conversion application, send it with the first premium amount to [a Unum address]."

### THE RELEVANT PRE-DEATH CHRONOLOGY

21.     On November 1, 2019, Decedent went on leave of absence from work due to a

–4–

flareup of her lupus and adrenal insufficiency illnesses. (UNUM's denial letter, 224-228) She was never able to return to work.

22.     On January 3, 2020, Decedent spoke by telephone with Kindred HR employee Paul regarding her benefits, including vision, dental, life, health, STD, LTD, and Paul stated that her benefits were active and were not going away, and that when FMLA ended, she would need to send a check to cover her premiums for these each month, and that by doing so, she would be able to keep those benefits.

23.     On January 3, 2020, Decedent began sending monthly checks for benefit premiums to Kindred, to specifically maintain and include all life insurance benefits.

24.     On January 22, 2020 Decedent received a secure email from Kindred stating that her FMLA had been extended.

25.     On January 22, 2020, UNUM mailed a letter to Decedent stating that Unum administers family and medical leave for Kindred through its leave management center, including leave taken under the FMLA. The letter stated that as of January 6, 2020, Decedent had two weeks of FMLA leave remaining, including any pending leave requested, and that if pending leave is not approved, this amount will change.

26.     On January 24, 2020, Decedent spoke by telephone with Kindred HUB HR Counselor, Don. Don stated that all of her employer life insurance coverages were still active and would continue along with dental, vision, STD, LTD, hospital indemnity, accidental death benefits.

27.     On January 29, 2020, UNUM, who had earlier advised Decedent by letter dated January 22, 2020 that Unum administers family and medical leave for Kindred through its leave management center, mailed another letter to Decedent confirming her enrollment in automatic

bank draft for accident and hospital indemnity benefits after processing her request to have monthly premium payments deducted from her bank account, further stating that the first draft was scheduled for March 12, 2020.

28.     On January 31, 2020, UNUM mailed a letter to Decedent stating that UNUM works with Kindred to administer family and medical leave, including Kindred personal leave. The letter expressly acknowledges that Decedent's leave is due to a **"serious health condition"** for November 5, 2019 through January 20, 2020 for FMLA, continuous and approved, and January 21, 2020 through February 2, 2020 for Kindred personal leave, continuous and approved. The letter further states: "This approval does not reflect the status of your disability claim. You will receive separate communication regarding your disability claim."   The letter continues: "These totals do not reflect your Kindred personal eight (Kindred personal leave) leave entitlements. If your leave qualifies, it will be approved and counted against your FMLA and Kindred personal eight (Kindred personal leave) entitlement(s). If your leave does not qualify, it will not be approved and may be treated according to your employer's attendance policy. For more information about your employer's specific leave policies, please read the attached **Important Information About Kindred Healthcare's Family and Medical Leave Policy."**

29.     The letter, referenced in the preceding paragraph, attaches its referenced Kindred's **"Important Information About Kindred's Leave of Absence Policies"** document. That document states that FMLA is for 12 weeks, and that if an employee is ineligible for FMLA, they may be eligible for and granted personal leave for medical reasons. It states that Kindred maintains group medical, dental, vision, life and disability coverage during the 12-week FMLA period. **It states that if the employee is eligible for disability or utilizing PTO**, and earnings for that paycheck are sufficient, premium deductions are withheld. However, when the employee does not

receive regular paychecks or does not have sufficient earnings for premiums to be withheld, they are required to pay their share of the insurance premiums directly to Kindred by personal check or money order payable to Kindred Healthcare. **This is exactly what Decedent did, as described below.** It further states that if leave is extended beyond 12 weeks, benefits will terminate, and the employee may elect to continue coverage under COBRA. **It does not specify what type benefits will terminate, nor what benefits are covered under COBRA, leading the reader to reasonably conclude that it means all benefits referenced above in the same letter, including life insurance coverages.** It states that if the employee is ineligible for FMLA leave and is granted personal leave for medical reasons, Kindred generally maintains the group medical, dental, life and disability coverage for the eight-week personal leave for medical reasons period. It further states that if the employee is eligible for disability or utilizing PTO, and earnings for that paycheck are sufficient, current premium deductions are withheld. However, if the employee does not receive regular paychecks or does not have sufficient earnings for premiums to be withheld, they are required to pay their share of the insurance premiums directly to Kindred by personal check or money order. **This is exactly what Decedent did, paid Kindred by personal check as described below, while Kindred also withheld premiums from Decedent's disability checks. So Decedent double-paid premiums for the now-denied life insurance benefits.** The letter further states that if the employee extends leave beyond eight weeks, benefits will terminate and the employee may elect to continue coverage under COBRA.  **It does not specify what type benefits will terminate, nor what benefits are covered under COBRA, leading the reader to reasonably conclude it means <u>all</u> benefits referenced above in the same letter, including life.** It further states that short term disability buy up insurance, permanent life, accident, critical illness, hospital indemnity, pet insurance, identity theft and legal plans will not remain active when on

leave, but that enrollment in those plans will be terminated as of the leave start date. **It further states that the employee will receive details mailed to their home address regarding continuation through a direct bill payment arrangement.**

30.     The Policy provides, in pertinent part:

> *"ONCE YOUR COVERAGE BEGINS, WHAT HAPPENS IF YOU ARE NOT WORKING DUE TO INJURY OR SICKNESS?*
>
> If you are not working due to injury or sickness, and if premium is paid, you may continue to be covered up to your retirement date."…

31.     At all relevant times, Decedent was not working due to illness, and UNUM acknowledged in its January 31, 2020 letter to Decedent, referenced above, that Decedent's leave is due to a **"serious health condition."**

32.     Decedent never did recover from the illness that took her out of work, she never did return to work due to that illness before ultimately dying from it, and premium was paid by Decedent for group coverage, including all life insurance coverages until her death, which occurred before her retirement date. Therefore, Decedent was covered at all times by the Plan and the Policies for life insurance benefits under the above-referenced "not working due to injury or sickness" provision, which provision is independent of the conversion provisions.

33.     Alternatively, if it is determined that the conversion provisions apply, which Plaintiff's deny, Decedent's employment never terminated prior to her death, and therefore the first premium did not come due under the express terms of the conversion provisions prior to her death, Unum was never notified by Kindred of any coverage termination, and a conversion application form which includes cost information was never mailed to Decedent's home address for her to complete and send with the first premium amount to the Unum address.

34.     Additionally, and alternatively, all allegedly required actions for Decedent to take

to maintain group life insurance coverages under the Plan and Policies were under legal extension by the COVID disaster relief applicable to ERISA notices, elections and other Plan and Beneficiary actions, thus extending any otherwise required timing of any required Kindred notice to UNUM as well as any required notice, premium payment or conversion action by Decedent.

35.     On February 11, 2020, UNUM mailed a letter to Decedent noting approval of long-term disability benefits. It lists her date of disability as November 5, 2019, benefits begin date as February 3, 2020, first payment period as February 3, 2020 through March 2, 2020 and waiver of premium date of March 1, 2020. Decedent remained on long-term disability benefits through the date of her death.

36.     On February 11, 2020, Decedent spoke by telephone with Valaria of Kindred Hub, who verified that all benefits were active, including all life insurance benefits, and verified amounts that were due by check each month.

37.     On February 20, 2020, Decedent spoke by telephone with Kindred HUB HR rep, Audrey, who stated that all of the group premium payments have been received, and that she was up to date on all such payments, including all life insurance coverage, and that there was no balance owed.

36.     On February 21, 2020, Decedent spoke by telephone with Jennifer from Kindred HR, who stated that when long-term disability benefits start, she will send a packet for COBRA options.

37.     A February 27, 2020 doctor's note by Dr. Sameer Ahmad, Hospitalist, notes that Decedent, with a history of lupus and adrenal insufficiency, presented to the hospital with abdominal pain secondary to pelvic versus rectal abscess. It was believed that the abscess had self-perforated and was subsequently draining through the vaginal opening.  Unfortunately, the

abscess had caused erosions and now created recto-vaginal fistula.   General surgery and GYN were on board and planned on corrective procedures once the initial stigmata of infection and inflammation corrected themselves.   Her care was noted as complicated by the severe nature of her lupus and adrenal insufficiency.   She was on very high dose steroids which had been doubled after phone consultation with her primary care/rheumatologist.   Her care was noted as severely impacted by derangement of electrolytes secondary to steroids, Lasix and metolazone.   However, she needed diuretics because of intense swelling in her legs despite physical measures to guard against swelling.   Diuretics were noted as adjusted and the patient would need to follow up with primary care/rheumatologist for laboratory values check and further adjustment in therapy.   She was discharged home with heavy medications: Aciphex 20 mg, Benlysta 120 mg, Carafate 1 g/10 mL, Cymbalta 60 mg, Depo-Estradiol 5 mg/mL, Estratest 1.25-2.5 mg, Fioricet 300-50-40 mg, folic acid 1 mg, gabapentin 600 mg, Imitrex 6 mg/0.5 mL, Imuran 25 mg, lorazepam 0.5 mg, Lumigan 0.01% ophthalmic solution, multivitamins, Plaquenil 200 mg, Premarin, ProAir HFA, tramadol 50 mg, Valacyclovir 1 g, vitamin B 12 1000 mcg/mL, vitamin C 500 mg, Zaroxolyn 5 mg and Zofran 4 mg.   Discharge diagnoses included pelvic abscess, vaginal fistula, immunosuppressed status, hypokalemia, systemic lupus erythematosus related syndrome, adrenal insufficiency, and irritable bowel syndrome.

38.    On March 07, 2020, as the COVID pandemic was in full explosion, Decedent was seen at Memorial Hermann Hospital Emergency Department complaining of dizziness/weakness, having fallen the day prior, hitting her head and right elbow. Dried bloody drainage was noted over the elbow with Tegaderm in place.   She had generalized bruising in various stages of healing to the arms.   Ondasteron 4 mg and potassium 10 mEq/100 ml were given.   Chest x-ray, CT scan of the brain, x-ray of the pelvis, electrocardiogram, and laboratory workup were ordered.   She was

discharged home ambulatory in stable condition, diagnosed as having wound care, head injury, and hypokalemia.   She was advised to follow up with her private doctor.

39.     On March 19, 2020, Decedent presented to Memorial Hermann Hospital Emergency Department after coming from her primary doctor's office after getting her PICC line antibiotic treatment.   She had a near syncopal episode and felt lightheaded.   Potassium 40 mEq, prednisone 160 mg, and APAP/butalbital/caffeine were given.   Electrocardiogram was obtained. She was admitted for treatment.

40.     On March 21, 2020, Internist Dr. Clayton Okpara noted that Decedent was admitted on March 19, 2020 and has a history of immunosuppressive state secondary to steroids, lupus, adrenal insufficiency, irritable bowel syndrome, and recent pelvic abscess with vaginal fistula. Nephrology and infectious disease were consulted.   She was scheduled for possible surgery for the vaginal fistula as outpatient within two to four weeks.   She was recommended to continue follow up with infectious disease doctor, nephrologist, rheumatologist, primary surgeon and primary care physician as an outpatient. She was advised to resume her home activity as tolerated with progressive ambulation.   Diagnoses included signs of infection and swelling.

41.     On March 31, 2020, while Decedent continued with her health struggles amid a pandemic, Unum mailed her an ADA Support Center letter to stating that the letter is specific to the ADA, and that she will receive separate communication concerning any changes or updates to her FMLA or disability claim. The letter states that her physician has released her to return to work on June 5, 2020 and that Kindred has approved her leave of absence through June 4, 2020. The letter further states that if she is unable to work on June 5, 2020, to provide an enclosed Medical Provider Questionnaire completed by her doctor no later than June 18, 2020, and that if documentation is not received by June 18, 2020, her file will be placed in an inactive status which

may result in a denial of additional leave time.

42.     On April 16, 2020, Decedent spoke by telephone with Kindred HUB HR, Melissa, who stated that she did not owe anything for her group benefits at that time, and that all, including life insurance, were active and payments current.

43.     On April 16, 2020, Decedent spoke by telephone with Adela from Mercer, who verified that Decedent's account was current with no balance, and that she did not owe anything and was still covered for all of her group benefits, life insurance included. Adela further stated that Decedent should call back mid-May (May 15) to see if she owed anything at that time for her group benefits and verified this was for her group benefits to include life insurance coverages, not through COBRA.

44.     On April 16, 2020, Decedent spoke with Mike in the COBRA department, who stated that there was not presently a COBRA account for Decedent, she was not in the COBRA system, and was still on regular employer group benefits.

45.     On April 16, 2020, Decedent signs her last will and testament.

46.     On May 15, 2020, Family Physician Dr. Asmita Marwah notes: Decedent was admitted on May 11, 2020 for repair of rectovaginal fistula with ileostomy placement.  She was cleared by surgery as well as GYN oncology for discharge with outpatient follow up.  Her ileostomy had good output.  She was working with physical therapy.  Home health was also arranged.  She needed to go on intravenous antibiotics which were set up as outpatient at Dr. Garnepudi's office.  She has severe lupus and adrenal insufficiency.  She was on chronic steroids.  She still had lower extremity edema which was multifactorial.  She was seen by nephrology as well.  She was discharged with Lasix three times a day along with potassium tablets.  She was medically stable on discharge.  She was diagnosed as having vaginal fistula,

lupus, fibromyalgia, adrenal insufficiency, and vasculitis.

47.     On May 27, 2020, UNUM mailed a letter to Decedent asking for information to review her long-term disability claim.

48.     On June 10, 2020, Decedent presented to Memorial Hermann Hospital Emergency Department with shortness of breath that started one week ago which was progressively getting worse.   Meropenem 500 mg, fentanyl, and furosemide 20 mg were given.   She was admitted to telemetry in stable condition.

49.     On June 12, 2020, Dr. Philip Noah, Interventional Radiologist performed a CT-guided pelvic drain placement.

50.     On June 17, 2020, Hospitalist Dr. Rajasekhar Bhoda noted: Ms. Rodriguez was admitted on June 10, 2020 with multiple medical problems including lupus and a complicated surgical history with multiple abdominal surgeries.   She presented with complaints of abdominal pain.   Imaging studies showed intra-abdominal fluid collection.   She was seen and evaluated by general surgery and conservative management was recommended.   She underwent CT-guided aspiration of fluid collection and placement of a JP drain.   She was seen and evaluated by infectious disease.   She was started on broad-spectrum intravenous antibiotics with intravenous Meropenem.   She was on high dose steroids at home for her lupus.   She continued her home dose of steroids with recommendations from her primary rheumatologist.   She did have slight pericardial effusion on imaging studies and was seen and evaluated by cardiology.   No intervention was recommended by cardiology.   Her hospital stay was uneventful.   PICC line was placed.   Home health was arranged for two weeks of intravenous antibiotics.   She was recommended to follow up with general surgeon two weeks after discharge for removal of JP drain and repeat CT scan of the abdomen.   Oxycontin 20 mg, potassium chloride 20 mEq and

–13–

spironolactone 25 mg were prescribed.   Her home medications were resumed.   She was diagnosed as having fluid collection at surgical site, acute chest pain, pericardial effusion, shortness of breath, adrenal insufficiency, fibromyalgia, vasculitis, and ileostomy status.

51.     On July 21, 2020, Decedent, together with Plaintiff, Jessica Hill, spoke by telephone with Doug from Kindred, who stated that Decedent's benefits (including all life, vision and dental) should have gone to COBRA January 21, 2020, but they did not, and instead were "still active." Doug stated that he verified with COBRA that there was no account set up for Decedent, that no COBRA paperwork or benefits paperwork had been sent to Decedent any time prior to July 21, 2020, that Doug would send the paperwork for COBRA benefit options in the mail, that the account that paid for Decedent's benefit premiums reflected that she had been paying premiums and that premiums have been being paid for her group benefits, including life, vision and dental, and that the benefits department would have the research department open a case to find out why Decedent did not receive notice about future changes in insurance coverage "per ERISA requirements." Doug further verified that Decedent, at the time of this telephone call, had active coverage on all group benefits, including life, vision and dental, because they failed to give her notice of any changes, and all information in their system reflected that she was still covered by all such group benefits. Doug verified that Decedent's paycheck stubs indicated that money was deducted for all group premiums, but that he was not able to determine how much overpayment Decedent had made since she sent in premium payments by check each month in addition to the deductions made from her paychecks, but that she had been paying too much, and was essentially double charged for benefits since February of 2020, although he could not determine where the money ultimately went. Doug also verified that the address where Decedent had been sending her checks to cover the cost of her group premiums was the correct address.

52.     On July 29, 2020, Mercer mailed Decedent a letter Regarding COBRA coverage, saying "You recently experienced an event of a/an Reduction In Hours - End of Leave which constitutes a qualifying event under the Kindred Healthcare Operating Inc. Group Health Plan(s)." The letter further stated that her coverage would end on September 29, 2020.

53.     On August 7, 2020, Decedent was admitted to the hospital for acute abdominal pain, fecal impaction, lupus, sepsis and vomiting. She was discharged home with Hospice care arranged.

54.     On August 08, 2020, Decedent died of systemic lupus vasculitis.  She had diverticular abscess with fistula.

## THE RELEVANT POST-DEATH CHRONOLOGY

55.     August 22, 2020, Plaintiff, Jessica Hill, sent a letter to Kindred enclosing Decedent's death certificate and requesting information regarding benefits.

56.     On September 22, 2020, Unum's Christine Hall emailed Kindred's Lynda Gulley asking for initial enrollment information and stating: "The claim form confirms premiums stopped on 01/21/2020. Was Teressa terminated on 01/21/2020? Was conversion offered to Teressa if she was terminated on 01/21/2020?"

57.     On September 25, 2020, Kindred's Lynda Gulley responded to Unum's Christine Hall: "Payroll confirmed she never worked hours after 11/5/2019. Unless she converted her policies, I do not believe this is a payable claim."

58.     On September 25, 2020, Kindred's Lynda Gulley additionally responded to Unum's Christine Hall: "She went out on FMLA 11/5/2019 and never returned. The 1/21/2020 date is when she LOA maxed meaning her FMLA had ended. She was still employed but her life benefits would have ended on that date. She would fall under Group 1. Unum would have sent her

–15–

port/conv. You can check with the AMS team to see if that happened. I am also checking with Kindred payroll to confirm if she ever returned to work. I will follow up when I get that information. I also have reached out to Mercer to get the additional information you requested. All those amounts are in their system."

59.     On September 29, 2020, Unum's Christine Hall emailed to Unum's conversion department: "Can you please confirm if you have a policy for Teressa Denise Rodriguez…?"

60.     On September 29, 2020, Unum's Christine Hall emailed to Unum's portability conversion department: "I hope you are well. Can you please confirm if you have a policy for Teresa Denise Rodriguez…?"

61.     On September 29, 2020, Unum's portability conversion department responded by email to Christine Hall: "We completed a search by name and SSN and did not locate anything for the insured below."

62.     On September 30, 2020, Unum's conversion department responded by email to Christine Hall: "We do not have a conversion policy for Teressa Denise Rodriguez."

63.     On October 6, 2020, Unum's Christine Hall mailed a letter to Plaintiff, Jessica Hill, saying that they are evaluating the claim.

64.     On October 7, 2020, Unum's Christine Hall emailed to the Unum AMS team: "I am reviewing a group life claim for Teressa Rodriguez… Coverage ended on 01/21/2020, would you be able to confirm if conversion was sent to Teressa?"

65.     On October 7, 2020, the Unum AMS team emailed to Christine Hall: "We are not showing a PCV mailer was sent to EE for coverage ending 01/21/2020."

66.     On October 7, 2020, Unum's Christine Hall emailed to Kindred's Lynda Gulley "Are you able to confirm when Unum was notified that Teressa's coverage ended on 01/21/2020?"

67.     On October 12, 2020, Unum's Jennifer Farley emailed to Kindred's Lynda Gulley following up on confirmation of "when Unum was notified that Ms. Rodriguez's coverage ended on 01/21/2020."

68.     On October 12, 2020, Kindred's Lynda Gulley emailed to Unum's Jennifer Farley, copying Unum's Christine Hall: "I have sent an email to the facility to try to determine what was the exact last day she worked. Payroll could not determine. Hopefully get back to you today."

69.     On October 13, 2020, Frederica Malone emailed to Lynda Gulley informing that Teressa's last day worked was November 1, [2019].

70.     On October 15, 2020, Unum's Christine Hall emailed to Kindred's Lynda Gulley: "Do you know the date that Kindred Healthcare advised Unum that Teressa's coverage ended on 01/21/2020? I understand her last day of work was on 11/01/2019. I do not see that conversion was sent to Teressa once her coverage ended on 01/21/2020."

71.     On October 15, 2020, Kindred's Lynda Gulley emailed to Unum's Christine Hall and Mercer's Robert Protulis: "Hi Bobby, can someone at Mercer confirm when life insurance Port/Conv information was sent to Unum? Her coverage ended on 1/21/2020. This employee has unfortunately passed away and Unum did not send Port/Conv information to the employee. Below is the employee. Thank you."

72.     On October 21, 2020, Unum's Christine Hall emailed to Kindred's Lynda Gulley: "I am following up on the email below to confirm if the date Unum was notified that Theresa Rodriguez is coverage ended on 1/21/2020 has been determined."

73.     On October 21, 2020, Kindred's Lynda Gulley emailed to Unum's Christine Hall: "Her FMLA exhausted on 1/21/2020. Below the coding is LOA max. SAP (Kindred's system) still has her coverage as active not that is not correct."

74.     On October 21, 2020, Mercer's Amy Santisi emailed to Mercer's Robert Protulis, Kindred's Lynda Gulley and Unum's Christine Hall and other Mercer personnel: "Hi Lynda, After further research, we found that port and convert files were never sent back in January for Teressa Rodriguez due to a discrepancy with the life event date on the backend. Please note this was a one off situation. Since she now has passed away, how would you like to move forward?"

75.     On October 23, 2020, Kindred's Lynda Gulley emailed to Mercer's Amy Santisi: "I will follow up with Unum to see if this will impact whether or not her death claim is payable."

76.     On October 23, 2020, Kindred's Lynda Gulley emailed to Unum's Christine Hall: "Wanted to make sure you received this. Will this make it a payable claim?"

77.     On October 27, 2020, Unum's Jennifer Flaherty responded to Unum's Christine Hall's request for review: "I agree with adverse [claim denial decision]. ER has confirmed LOA ended after 12 weeks (consistent with policy definitions) and premiums ended at that time. For both basic and supplemental definitions in policy, the end of coverage/premiums and DOD are several months apart. Regardless of if port/convert was offered, the time past from end of converge/premiums to DOD is significant and outside of any extension. Letter was briefly reviewed, and I recommend working with Lead, Kristi Staples on content. Min hours is not the rationale to use here for this adverse - consider LOA and terms of LOA within policy along with termination and premium information. Once reviewed with Kristi and edit to complete, send back to me for final review. Please notify ER as needed of adverse decision as well."

78.     On October 28, 2020, Unum's Jennifer Flaherty responded to Unum's Christine Hall's request for review: "I agree with adverse, letters reviewed and I have made some additional edits and added policy provisions – please review changes and then letter is OK to send."

79.     On October 28, 2020, Unum mails its initial denial letter to Plaintiffs signed by

Christine Hall.

80.     On November 5, 2020, Unum's Christine Hall's phone note of conversation with Jessica Hill states: "Jessica seemed frustrated as she does not believe [Decedent] was aware of coverage ending after 12-week LOA.…"

81.     On November 5, 2020; November 6, 2020, Unum's Christine Hall's phone notes reflect both Plaintiffs' inquiries and statements that Decedent was not aware of coverage ending after a 12-week LOA period and that nobody ever offered her conversion rights.

82.     On December 10, 2020, Plaintiff, Jessica Hill spoke by telephone with Kindred Hub's David, who said that Kindred still shows active benefits until the date of Decedent's death.

83.     On December 10, 2020, Plaintiff, Jessica Hill spoke by telephone with Paul of Mercer, who stated that there was loss of coverage because ERISA was not met, that Unum should have notified Decedent of any changes to her benefits status, and that he did not see record of any notification of change of benefits prior to July 29, 2020. He also noted a July 21, 2020 research document that Mercer opened to determine why Decedent was not notified of any change of benefits. He stated that Decedent was never given the option to get conversion of life insurance benefits. Paul said that usually the insurance company would send notice to an employee regarding conversion.

84.     On December 10, 2020, Kindred's Lynda Gulley emailed to Unum's Michael Willis: "The deceased employee… apparently was not sent a Port/Conv life information when she exhausted leave time as of 1/22/2020. Mercer's response is below regarding the deceased daughter contacting Mercer. I do not know if Unum has already denied the claim (I would think this is not a payable claim) but how to proceed if she was never notified to convert her life plans?"

85.     On December 10, 2020, Mercer's Amy Santisi emailed to Kindred's Lynda Gulley,

copying other Mercer and Unum personnel: "We just got a T2 about this EE. The daughter called in and was stating that she never got notification that life insurance was canceled back on 1/22/20 and she quoted the "RISA Law" to the BC. I do want to advise the BC that the EE receives a disability packet from Unum when they start their leave that if they do not return from the approved leave then the benefits will end. Would you like me to relay this information to the BC? This information in our knowledge base system. The BC did state that they spoke with Christine Hall stating we are the ones who notify the EE. I am not sure if you wanted to reach out to the daughter who called…"

86.     On December 10, 2020, Kindred's Lynda Gulley emailed to Mercer's Amy Santisi copying other Mercer personnel: "Thanks Amy, I have just forwarded the information over to Unum to see what are the next steps if this employee did not receive a Port/Conv letter when she exhausted leave and ending her life benefits. More to come."

87.     On December 15, 2020, Unum's Maureen Turner emailed to Kindred's Lynda Gulley: "I am writing concerning an appeal request we received on a life insurance claim submitted for Teressa Rodriguez. Her last day of work was 11/1/19. She passed away on 8/8/20. Her beneficiary has indicated that monthly checks were being sent to Kindred as well as checking account deductions for benefit premiums. Can you confirm if any of those premiums were for life insurance coverage? Or were deductions for health insurance coverage?"

88.     On January 11, 2021, Kindred's Lynda Gulley emailed to Unum's Maureen Turner: "Found this [meaning this email] in draft and was never sent. Mercer did confirm that Port/Conv information was never sent to Unum so she never received information allowing her to continue life benefits? Let me know how this affects the life claim. The deceased went out on FMLA beginning 11/5/2019 and exhausted FMLA on 1/21/2020 and terminating benefits. She did

send in checks and there was one posted against her supplemental life. This payment was for an arrears that was accumulated during her FMLA leave time.

89.     On January 14, 2021, Unum issued its denial of Plaintiffs' timely administrative appeal letter authored by Ms. Maureen Tuner.

90.     On January 14, 2021, Unum's Maureen Turner emailed to Kindred's Lynda Gulley: "I wanted to follow up concerning the life insurance claim submitted for Teressa Rodriguez. We have completed our appeal review and we have determined group life insurance benefits are not payable for Ms. Rodriguez under the policy. Please let me know if you have any questions."

91.     At all relevant times, it was always, and obviously, the intention of Kindred, Mercer, The Plan, Decedent and Plaintiffs to do everything and pay everything necessary to maintain insured status for all benefits under the Plan and the Policies including, obviously, any and all life insurance benefits through and until the time of her death.

92.     After undertaking to advise Decedent about requirements to maintain group benefits after stopping work due to illness, Unum doing so in several written communications, Kindred, Mercer and the Plan in telephone communications, nobody from Unum, Kindred, Mercer or The Plan ever communicated to Decedent or Plaintiffs anything about conversion requirements, nor did any of them provide Decedent with any conversion application, nor about any deadlines for maintaining group life insurance coverage being triggered by events as described in Unum's initial denial letter and denial letter on appeal prior to Unum issuing those denial letters.

93.     At all times prior to her death, Decedent, Plaintiffs, Kindred, Mercer and The Plan were all of the belief and intention that Decedent's coverage under the Plan and the Unum Policies remained in full force and effect through the time of her death because she paid premium both by

paycheck deductions as well as sending checks for premium payments to cover Unum's life insurance policy premiums precisely as instructed by Unum in its written communications to her, including, but not limited to Unum's January 31, 2020 letter to Decedent with attachment, and in the "not working due to injury or sickness" provision of the Unum policy, and precisely as instructed by Mercer and Kindred in their telephone communications with her, and as assured in multiple telephone conversations with her that coverage for life insurance benefits remained in effect under The Plan and The Policies, and Decedent and Plaintiffs relied upon all such communications to their detriment.

94.     Decedent and Plaintiffs relied on communications by Mercer, Kindred and The Plan that Decedent was to pay premiums by check to Kindred in order to maintain life insurance coverage, and that her checks were received, and Decedent's coverage for life insurance benefits remained in effect under The Plan and The Policies at all relevant times until Decedent's death.

95.     Decedent and Plaintiffs took absolutely every step necessary to their knowledge to maintain Decedent's life insurance coverage, and at no time did any person or entity inform any of them in any way that any additional documents needed to be processed, that any additional requests needed to be made, or that any further action whatsoever was required on their part to do so until after Decedent's death.

96.     Had anyone from Unum or Kindred or Mercer or The Plan informed or advised Decedent or Plaintiffs of the need to take any steps whatsoever that were not taken, in order to maintain Decedent's life insurance coverage under The Plan and The Unum Policies, those steps would have been immediately taken by Decedent and Plaintiffs.

97.     Kindred and/or Unum and/or Mercer took part in preparing a Summary Plan Description ("SPD") of The Plan.

98.     The SPD of The Plan failed to sufficiently, accurately, comprehensively, clearly or reasonably apprise Decedent or Plaintiffs of their rights and obligations under The Plan and The Policies with regard to circumstances which may result in disqualification, ineligibility or denial or loss of life insurance benefits under The Plan or The Unum Policies as Unum claims to be the case in its denial letters, nor available steps, and how and when they should take those steps to maintain those benefits, including conversion, and in fact affirmatively misled them regarding same.

99.     The Plan as a whole failed to sufficiently, accurately, comprehensively, clearly or reasonably apprise Decedent or Plaintiffs of their rights and obligations under The Plan and The Policies with regard to circumstances which may result in disqualification, ineligibility or denial or loss of life insurance benefits under The Plan or The Unum Policies as Unum claims to be the case in its denial letters, nor available steps, and how and when they should take those steps to maintain those benefits, including conversion, and in fact misled them regarding same.

100.    The Unum Policies failed to sufficiently, accurately, comprehensively, clearly or reasonably apprise Decedent or Plaintiffs of their rights and obligations under The Plan and The Policies with regard to circumstances which may result in disqualification, ineligibility or denial or loss of life insurance benefits under The Plan or The Unum Policies as Unum claims to be the case in its denial letters, nor available steps, and how and when they should take those steps to maintain those benefits, including conversion, and in fact misled them regarding same.

101.    Kindred, Mercer, The Plan and Unum failed to sufficiently, accurately, comprehensively, clearly or reasonably apprise Decedent or Plaintiffs of their rights and obligations under The Plan and The Policies with regard to circumstances which may result in disqualification, ineligibility or denial or loss of life insurance benefits under The Plan or The Unum Policies as Unum claims to be the case in its denial letters, nor available steps, and how and

when they should take those steps to maintain those benefits, including conversion, and in fact misled them regarding same.

102.    At all relevant times, Kindred, Mercer and Unum were ERISA fiduciaries, and owed Decedent and Plaintiffs, as participant and beneficiaries, all of the duties prescribed under ERISA, including without limitation those set forth in ERISA § 404(a).

103.    Plaintiffs have exhausted all required administrative remedies prior to filing this lawsuit.

104.    Plaintiffs have incurred attorney fees and court cost obligations to litigate this case.

**CAUSE OF ACTION 1**
**AGAINST UNUM AND THE PLAN UNDER ERISA § 502(a)(1)(B)**

105.    Plaintiffs are entitled to life insurance policy proceeds from The Plan and Unum because they meet all qualifications for benefits under the terms and provisions of The Plan and The Unum Policies.   Plaintiffs are also entitled to reasonable attorney's fees as well as pre- and post-judgment interest on all sums due from The Plan and Unum.

**ALTERNATIVE CAUSE OF ACTION 2**
**AGAINST KINDRED, MERCER AND UNUM UNDER ERISA § 502(a)(3),**
**§ 102(a) and (b) and §404(a)**

106.    Only in the alternative, and only in the event that the court were to determine that Plaintiff's **CAUSE OF ACTION 1** were without merit, Plaintiffs are entitled to judgment against Defendant, Kindred, as Plan Administrator and a fiduciary of The Plan, for breach of fiduciary duty for failing to take the necessary steps, or improperly advising them, or failing to advise them regarding, or misrepresenting the terms of The Plan and The Unum Policies regarding steps they needed to take in order to exercise conversion rights or otherwise maintain life insurance coverage under The Plan and The Unum Policies, despite actively participating in communications

regarding that subject matter with the understanding that Plaintiffs and Decedent were seeking advice regarding the same and that they were uncertain or confused about what steps they needed to take.

107.    Additionally and alternatively, Plaintiffs are entitled to judgment against Defendants, Mercer and Kindred's contractual designee for relevant plan administration duties and a fiduciary of The Plan for breach of fiduciary duty for failing to take the necessary steps, or improperly advising them, or failing to advise them regarding, or misrepresenting the terms of The Plan and The Unum Policies regarding steps they needed to take in order to exercise conversion rights or otherwise maintain life insurance coverage under The Plan and The Unum Policies, despite actively participating in communications regarding that subject matter with the understanding that Plaintiffs and Decedent were seeking advice regarding the same and that they were uncertain or confused about what steps they needed to take.

108.    Additionally and alternatively, Plaintiffs are entitled to judgment against Defendant, Unum, as Plan Claims Administrator and a fiduciary of The Plan, for breach of fiduciary duty, for failing to take the necessary steps, or improperly advising them regarding, or failing to advise them, or misrepresenting the terms of The Plan and The Unum Policies regarding steps they needed to take in order to exercise conversion rights, pay premium, to whom, or otherwise maintain life insurance coverage under The Plan and The Unum Policies, and failing to provide them with a conversion application, despite actively participating in communications regarding that subject matter with the understanding that Plaintiffs and Decedent would likely rely upon those communications, and would likely need to take steps to maintain life insurance coverage, were in need of advice regarding the same and that they were likely uncertain or confused about what steps they needed to take.

–25–

109.     Additionally and alternatively, Mercer and Kindred failed to adequately notify Unum of the actual facts regarding Decedent's employment status as it related to Decedent's timing and need to convert coverage, and failed to notify Decedent of her conversion rights and required timing of same, failed to provide her with a conversion application, and failed to remit to Unum premiums both deducted from Decedent's paychecks, disability benefits checks and sent to Kindred and/or Mercer for purposes of maintaining her life insurance coverage, while continuously advising Decedent that she had taken all necessary steps to do so, nothing more was needed, and that her coverage remained active through the date of her death.

110.     Kindred is liable for all acts and omissions of Mercer, which acted as its agent.

111.     By continuing Decedent's enrollment in The Plan and The Policies, acting consistently with enrollment or conversion or continuing coverage being in effect or accomplished, accepting premium payments for the coverage, and representing by their communications with Decedent that coverage remained in place after the date it allegedly lapsed, Defendants, Kindred, Mercer, The Plan and Unum, have waived any conversion application requirement or requirement that Decedent's premium payments be passed on from Mercer or Kindred to UNUM, and are estopped from asserting that coverage was not in effect under the Plan or the Policies when Decent died.

112.     By failing to properly administer the conversion process, or any conversion application requirement or requirement that Decedent's premium payments be passed on from Mercer or Kindred to UNUM, failing to advise Decedent of the purported requirement that she convert or port his coverage, failing to provide notice of her right to convert or port his coverage, accepting all premium payments and yet failing to advise Decedent that her policy was going to and ultimately had allegedly lapsed, Defendants, Kindred, Mercer, The Plan and Unum, breached

the fiduciary duties they owed to Decedent and his beneficiaries, and have waived any conversion requirement.

113.    Plaintiffs are entitled to reformation of The Plan and The Unum Policies based on communications among Unum, Kindred and Mercer, Decedent and Plaintiffs as detailed above.

114.    By informing or misleading Decedent that she remained covered by group life insurance benefits after the policy allegedly lapsed, Defendants, Kindred, Mercer, The Plan and Unum, misrepresented to Decedent and Plaintiffs that the coverage remained in place beyond the date it allegedly lapsed, thereby breaching the fiduciary duties they owed to Decedent and Plaintiffs.

115.    Defendants, Unum and The Plan, have been unjustly enriched by retention of all premiums and retention of the life insurance benefits properly owed to Plaintiffs.

116.    Defendant, Kindred, has failed to respond to multiple written requests for ERISA plan documents, entitling Plaintiff's to daily statutory penalties as provided by law.

**WHEREFORE**, Plaintiffs respectfully pray for entry of judgment in their favor and against Defendants as follows:

a.    Against Unum and The Plan for enforcement of Plaintiffs' rights under the terms of The Plan and The Unum Policies; or alternatively

b.    Against Kindred, Mercer, The Plan and Unum for an equitable surcharge in the full amount of all allegedly lapsed life insurance benefits to make Plaintiffs whole for their breaches of fiduciary duty; and

c.    Against Kindred, Mercer, The Plan and Unum, for an equitable award of pre- and post-judgment interest; and

      d.       Against Kindred, Mercer, The Plan and Unum, for an equitable award of reasonable attorney's fees and costs; and

      e.       Against Kindred, Mercer, The Plan and Unum for disgorgement of any profits they have realized by the wrongful retention of benefits rightly owned by Plaintiffs;

      f.       Against Kindred, for daily statutory penalties failure to respond to multiple written requests for ERISA plan documents as provided by law.

      g.       For such other and further relief as this Court deems just and proper.


                    Respectfully Submitted,

                    s/J. Price McNamara

                _____

                **J. PRICE McNAMARA**
                Bar Nos: LA 20291 & TX 24084626
                10455 Jefferson Highway, Ste. 2B
                Baton Rouge, LA 70809
                Telephone: 225-201-8311
                Facsimile: 225-612-6973
                price@jpricemcnamara.com
                Attorney for Complainant